Wood Group Production Services v. Director Let's see, we have Mr. Sewell. Am I pronouncing that correctly? Mr. Sewell for Wood Group. You may proceed. I think my colleague provided some color copies of exhibits that are in the appendix, and I don't know which display the area in question, the fixed platform offshore. I don't know if that would be helpful during your questioning or whatever, but I have no objection to those being provided to your honors. Yes, just hold on one second. Are they the same? They are the same, but I don't know how degenerate your copies are, and these are pretty clear. You don't have a disagreement with? No disagreement, there are the trial exhibits. Yeah, we can take those, thanks. Thank you. Thank you. And why don't you give him 15? Can we go back to 15? Thank you. You may proceed. Good morning, Your Honor. May it please the Court, my name is Scott Sewell and I represent Wood Group and Signal Mutual, the longshore carrier for Wood Group in this Longshore and As your honors probably know from reading through the briefs, in order for an injured worker to be covered and eligible for benefits under the LHWCA, he has to meet both situs and status. In other words, the injury must take place on a maritime situs, and the worker must enjoy and must perform his duties in maritime employment. And we're here this morning because the Benefits Review Board, which we may call the BRB or Board, got it wrong as to both elements. Mr. Malta's daily and regular activities on a fixed platform and state territorial waters was not a maritime situs, it didn't take place on a covered situs, and those activities as a warehouse man on that fixed platform did not pertain to a maritime enterprise, but instead were absolutely and 100% devoted to the production of oil and gas, which the Supreme Court has repeatedly held to be non-maritime in nature. Now on the situs part, as you know, our precedents draw a distinction between a geographical part of that and a functional part of that. Are you contesting the geographical part of that? Absolutely not, your honor. That's not before us. This is evident in the photographs. Today it's entirely open water, fairly shallow of course, but back in the day I'm sure it was prairie marsh when we secured this land from the French. But in any case, what happened with Mr. Malta, and I don't know if the factual background might help a little bit. Well, we've read the briefs. Thank you. All right, your honor. The long and short of it is he received a telephone call, or a radio call, from the crane operator saying there's a part coming in from one of the satellite wells. He was at his office chair in front of his computer in his air-conditioned office in the warehouse, stepped outside, and he landed a cargo basket or a carry-all basket or a supply basket, he used different terms for it, much like a crab trap that once it hits the deck it just collapses in its entirety. And it was a CO2 cylinder. The CO2 cylinder came from a satellite well. It was actually on a generator on that satellite platform. It was not accompanied by a bill of lading or a contract of a freightment or any kind of cargo documentation whatsoever. In fact, it was a part that, who knows when it was initially installed out on that platform. But the bottom line is he physically handled that piece of equipment on the fixed platform when it began discharging and causing injury to him. With regard to situs, your honor, as you mentioned, geographical situs, situs itself is composed of two parts, geographic function and a functional component. This court, en banc, has recently determined what a geographical situs means. And I know that the government and counsel for the claimant have spent some time talking about the plain text and the language that was used in arriving at the geographical component of situs. That's not the case here. What's at issue here is because this fixed platform doesn't meet the statutorily enumerated items that meet situs, it has to qualify as an other adjoining area. That's where the functional element comes in. And then the court has to look at, well, what was the purpose of this fixed platform? Candidly, for the last 35 years, it's been pretty crystal clear that a fixed platform devoted solely to the production of oil and gas is not a maritime situs. There have been some distinguishing cases. Hudson v. Coastal Production involved a facility where they, much as this one, would separate the oil and gas and salt water and inject that. But they also had a barge on site that they would load the product into that they would actually load into third party barges. So it became actually a source of placing product into the stream of commerce. It's not the case here. This is 100% a, it's called the social facility. It's the facility where 22 men live during their hitch and shower and eat and do everything else while some of them go out into their boats to the various satellite wells and do their work. Of course, Mr. Malton never left the facility. He was clear about that. 100% of his job duties were at the fixed platform social facility. Well, in the picture that I'm looking at, this nice color photo, I can see all these cranes. Yes, sir. In the color photo, they're in yellow, so you can really see them well. What are the function of the cranes on this? What is it? This facility is the central facility, right? That's correct. Meaning there are satellite facilities. That's correct, Your Honor, which are unmanned. This is where everyone stays. This is where everyone has their safety meeting in the morning, and then everyone disperses out to their various wells. The operators will check the gauges. What are the cranes doing? The cranes will load and unload items from ships. I say ships. Joe boats, field boats, and the feet skip. Vessels. I'm looking at the definition under Section 903. It says, other joining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel. Now, why isn't this facility, at least in part, customarily used to load and unload vessels? Because the actual test, Your Honor, set forth in that fixed oil production platform can only be an other adjoining area if it engages in maritime commerce. If its sole purpose is the non-maritime pursuit of oil and gas production, it is not a maritime sinus, and that's exactly what we have here. But what about the significance of the safe harbor? Doesn't that qualify the central facility as having a maritime purpose? There's been no evidence of what the safe harbor was used for, Your Honor. Well, we think it was a safe harbor for the ships to come in to load and unload safely in a harbor. This facility originally was on an island a couple of miles further west. This is about five miles east of Point LaHashe out in Black Bay. It was originally on an island that was washed away during Hurricane Katrina. I think the purpose of this little area, as you can see on whatever trial exhibit that was, the safe harbor area is obviously to place the fuel boats, because there are a number of fuel boats. As I mentioned, there are several operators who every day operate their fuel boats to go out. If there's inclement weather, they come in and tie off in this area as opposed to having it potentially tied off to the plus 10 deck or someplace else. That's pretty critical. It's not a safe harbor site for fishermen to come in. It's not a site for seagoing vessels to come in and buy the parts from Mr. Malta. He was crystal clear when I asked him those questions, those specific questions. Do you sell any of these parts to anyone else? I mean, Chevron's out there and Apache's out there. All sorts of people are out there in this area. If they're missing some wing nuts, can they come over here and get some from you? Absolutely not. Everything is here solely for our own oil and production work, oil and gas production work. It's not a facility, and the safe harbor is not designed for, and there's been no evidence that it's designed for, again, any kind of overt maritime ships in peril purpose. I think it's just a hub for transporting cargo parts, equipment to your satellite facilities, right? The central facility itself, Your Honor, and Mr. Malta's duties as the warehouse man is to ensure that he has the necessary parts available so that the operators can keep the oil and gas production going. I thought you said some of the parts were sent to the satellite facilities. I would imagine so, Your Honor. For instance, in this particular case, this injury occurred because one of the workers found that the CO2 cylinder on the generator on the satellite well was reading empty, and it wasn't. It was brought back to the central facility where later it would be put on the supply boat that goes in and be worked on. Of course, unfortunately for him, it began discharging and chased him like a bottle rocket on the ground, causing his injury. But the bottom line, Your Honor, is that this is not a maritime situs. Again, the functional component looks for maritime commerce, and there is no maritime commerce going on here. You mentioned cargo, and I haven't danced around the issue. I call it loading and unloading in my brief, instead of saying placing supplies or transferring supplies and equipment, because that's what we all call it. It's loading and unloading. I'm not concerned about that because this court has repeatedly held in the Munguia case in the Fifth Circuit versus Chevron that this is not cargo, as that term is used in maritime commerce. That goes to status a little bit. I don't want to finish the situs and I can segue into it, but the Chevron case, the Munguia case is instructive because that individual was loading and unloading the exact same stuff that Mr. Malta would ensure would be put on these field boats. And the bottom line is, those supplies and that equipment must be marine cargo, as that term is used. And in the Fifth Circuit, the court has expressly held that this is stuff, when it's 100% used for oil and gas production, it has no maritime flavor. The thread that runs through all of this is oil and gas production, maritime commerce, and it's not. The Fifth Circuit for many years said it was. We were one of the few circuits that did. And then the Supreme Court came out in 1985 and made crystal clear that absolutely not. There's nothing inherently maritime about oil and gas production work. So the loading and unloading of supplies and equipment used for oil and gas production is not maritime either. You're talking about Herb's Welding? The Herb's Welding case, Your Honor, correct, in 1985. So, to the extent that there is some citing to cases that pre-exist Herb's Welding, I think they had to be read in that context. I mean, I know that Pippin v. Schell was written in one of these, cited in one of these briefs, and that was a case that said that oil and gas is maritime commerce. Of course, it might be cited for other purposes as well, but keep in mind that what happened here and what the court below did, the Benefits Review Board, is they cited the Gilliam, which is a pre-Herb's Welding case. I was about to ask you about Gilliam. There you go, Your Honor. Tell me about Gilliam. Gilliam's a very different matter. It's, you know, using the old proverb of Oshom's razor, you know, when you hear hoofbeats you think of horses and instead they're zebras or donkeys or mules or whatever. In the Gilliam case, what you had was an individual working on a barge in navigable waters. They're building a bridge. Of course, the Supreme Court's clear about that. If you're working on the bridge, you're not covered by the Longshore Act. It's an extension of land. But those people working on the barges, such as Mr. Gilliam, who was actually physically hooking up the cargo on that barge, he is covered by the Act. Clearly, there is a maritime component to it. First and foremost, the Supreme Court in Perini said, if you're injured while working in your regular employment on navigable waters, end of discussion. You're covered. In fact, a few years ago, I had two wood group cases on the other side of the river involving the mechanic. He was injured on the platform, covered by the State Act. His replacement, the man doing the exact same job, was injured on the crew boat going back into Venice when there was a collision. He's covered by the Longshore Act because he was on navigable waters at the time of the injury. Here, Mr. Malta is not on navigable waters. He's on a fixed platform. So I think that's one of the important things that distinguishes the Gilliam case from the whole line of oil and gas production cases. What he was doing, one, he was on navigable waters, so he's covered anyways. But beyond that, he's not doing oil and gas work. There's no maritime flavor to doing oil and gas production work, which is what the Supreme Court has said, and which is what this Court has said on a number of occasions. And so I get that part of your side of this argument. You're relying on sort of the general umbrella of Herb's Welding and then Thibodeau, Lunguia, however we pronounce that, and you distinguish Gilliam? Yes, sir, Your Honor. I mean, the overarching penumbra of the Herb's Welding case is what really carries through on this. I happen to do longshore work in a number of different venues, shipyards and ship repair facilities and true ILU, ILA longshoremen at the docks unloading cargo from the ocean-going ships that we have in port. For the last 30 years, this kind of work, the oil and gas work, if you're injured on a fixed platform, the entire industry is predicated on premiums are charged and assessed based on the fact that these guys are covered by the state compensation scheme based on Herb's Welding. And there have been outliers. As mentioned, that Hudson case was a guy who worked on a fixed platform. But what happened in that case is they kind of looked at it and said, well, it's not just a fixed platform. You also actually, when you separate that oil and gas, you set some of it into a vessel and you actually load cargo into third-party vessels here, right? There are third-party vessels coming into and out of the safe harbor. I don't know about that, Your Honor. There's record evidence. So there's record evidence cited from the July 14, 2014 transcript, pages 33 and 34, that say third-party vessels are coming into the safe harbor and cargo is coming off of them. So if I give you, just assume that all the stuff that from the central facility, putting onto the boats to go out to the satellite wells for the oil and gas exploration, let's put that to one side. And let's just talk about the stuff that the third-party vessels bring to the central facility and have unloaded onto the facility. And I want to make sure we're clear, Your Honor. One, yes, I think, in fact, all these little Joe boats that are used out in the field are not owned by Wood Group. They're owned by third parties as well. So in that context, I don't think Wood Group has any vessels out here. Wood Group doesn't own the facility either. We're just workers there. Crane operators are employed by Premier, yet another third party, as you wanted. And, of course, there's a third-party lawsuit pending against the manufacturer of the CO2 cylinder. To answer your question, it still has to be maritime commerce. So what kind of stuff is coming off of the third-party vessels to be unloaded at the central facility, like groceries or medical supplies? That is correct. And what I'm saying is that all of the materials that are used in herbs welding, they have to be supplied. There is no organic water there. There's no sewage there. There's no farms and such. So, of course, everything that's on there, from the laundry soap to the sheets to the toothbrushes, come in via vessels. And so why is that not the end of the stream of maritime commerce, where the groceries are bought? You know, if I have groceries bought and they're delivered to my home and I have them delivered to my home, why is it not the end of the stream of maritime commerce to have it unloaded at the central facility and consumed there? Okay. Well, one of the things to be careful about, Your Honor, is that the point-of-rest theory has not been adopted in longshore cases, because that used to be kind of an easy distinction. Once it's actually landed, it's not cargo anymore, is it? And the Supreme Court has said, well, no, you have to look further to that. That's why the guys who are actually loading tanks onto the rail cars that came off the ship, there is no independent commercial transaction taking place. All these parts that come out here aren't being purchased, such as you purchasing your groceries from, you know, Diner Dash or whatever. These are all things that are purchased back in the home office in Lafayette or New Iberia, and they're regularly scheduled, and they come out. Mr. Malta doesn't go down and sign a receipt. There's no bill of lading tendered to him with mate's receipts indicating that the cargo was received in good order and condition. That simply doesn't exist in this world. This is oil and gas production, and what happens on this fixed platform is no different than what happens at the fracking sites up in Wyoming or anywhere else. And I think, again, that's the thread that needs to be looked at constantly. There's no maritime commerce going on here. The Fifth Circuit has held in some of these previous cases, the Munguia case being one of the most noteworthy ones, that, yeah, these are vessels, and yeah, you're loading and unloading, but that doesn't solve the analysis. The analysis is, what are you doing, and is it related to maritime commerce? And it's been consistently held that this is not maritime commerce. Thank you. Anything else? Thank you. Mr. Robert? Correct. Thank you. Go ahead. May it please the Court, my name is Al Robert. I have the privilege of representing Mr. Luigi Malta, who is the claimant in this case. I do think it's worth noting, Your Honors, that this is an LHWCA case and that coverage in these cases is to be afforded expansively, to be construed expansively. That's both per the Act and per binding Supreme Court precedent. I appreciate that Your Honors have obviously read the record and seen the photographs, which indicate the safe harbor. And I think that's a key component to this case that, for whatever reason, the claimant, he got up here and he spoke that for years it's been the case that if you're working on a fixed production platform, then under Herb's welding, the industry considers that not to be a matter with maritime purpose. And I understand that, Your Honor, but at the same time, my opponent also acknowledges that there are exceptions to that case, besides the coastal production versus Hudson, which does the exact same thing that takes place on Central Facility. The only thing that's different is that there was a barge that some of the oil was stored in intermittently rather than going in via a pipeline. There was nothing different with what the claimant on coastal production did with what anybody did on the Central Facility location. I think what's important, Your Honor, is what this function of judging the facts in the law and asking to take that away from the ALJ and from the BRB and saying we're going to act like a computer and apply this functional rule that if someone was hurt on a fixed production platform and there's no barge there, then that's the end of the analysis. And that's what they're essentially asking this Court to do here. There are no facts in dispute here. Is that right or am I wrong? I think there may be to the extent that my counsel was saying that there's no evidence of third party vessels. Your Honor, I think you've cited in the record where that's there. Whether or not he disputes that, I don't know. But certainly I think the underlying facts are not in dispute. So as it relates to the analysis that this Court is being asked to do, is that this is in fact something that must be addressed on its own merits. Central Facility is not a standard oil and gas platform where someone has gotten hurt. This is a platform that took the place of a land-based essentially wharf and warehouse and dock facility that was destroyed in Hurricane Katrina. So instead of rebuilding on that facility, it's essentially the size of four large fixed platforms that are all interconnected by catwalks. And what they did is this Central Facility serves as the hub for the 15 or 16 other satellite facilities. It serves as a warehouse in the stream of maritime commerce. And to the extent that there's arguments as to whether or not this is stuff to other people in the field, I think that's sort of a red herring. I don't really get that. To the extent that the items that were being brought in to this facility, you see this building on the first page with the helicopter pad. The larger building that's closer to it with the crane on it, that's the warehouse. Now, that's a massive structure. That's a big building. In that warehouse they were being supplied all of the storage and the supplies that were needed for Central Facility itself and for the 15 surrounding satellite facilities. So there would be supply barges that would come in. To be unloaded. What percentage of Mr. Malta's time was spent loading and unloading? Twenty-five to thirty-five percent of each hitch. Is that in dispute? That's not in dispute, Your Honor. And I think that goes to the heart of what's here before this court. Is there sort of a, I don't know if it's what the right word is, but there's a confusion or a mixing between the status element and then the second part of the functional analysis with this idea of cargo. Like it's confused and if you see it in Woodgrove's briefs, he discusses cargo in both the functional analysis and he also discusses the idea of cargo in the status analysis. And I think it's misplaced because I understand his concern and the argument that he's trying to make, but what the issue before us here is whether or not Mr. Malta in the function, I mean, and this is from the P.C. Pefferley versus Ford case and the Supreme Court decision speaking to status, that it's not a location issue. So it doesn't matter that he's on a fixed platform. What the court is directed to look to is what the function that the claimant is performing. And here, there's no doubt that he was actually unloading a vessel when he was hurt. That satisfies the first way you can meet status. As it relates to meeting status, the second way is if a large portion of your job is involved with loading and unloading vessels. There's case law saying as little as 10% is sufficient to satisfy that element. We have here uncontroverted 25 to 35% of Mr. Malta's job was loading and unloading vessels. I think what the petitioner is arguing is that a finding of coverage in this case would somehow open the door to somebody who's simply getting off of a crew boat onto a fixed platform would be covered under LHWCA. I understand that that might be a concern, and that's where I suggested there was a confusion between the situs and the status elements. And I think in the brief, counsel in Wood Group, I think did a good job of outlining this court's precedent in Thibodeau where you have to consider the flavor of other adjoining areas. And I think that's how you get to avoid that issue that he's raised as a potential concern is that this is a specialized platform. This is different from most oil and gas production versus Hudson in that you're asking the BRB and the ALGA. They've looked at the independent facts, and they said, yes, based on the function that's performed here and the facts that are at issue here, there's coverage. He's loading and unloading a vessel, and the facility that we're here is maritime in nature because it deals with, it essentially acts like a wharf and a warehouse, just like the preexisting facility did on the Stone Island that was destroyed in Hurricane Katrina. So to the extent that that's, I think that's his best argument, but I don't think it goes that far if you look at the individual facts of this case. And anybody that would come before the ALJ or BRB would properly say, yes, that case is distinguishable because this is just a simple platform based on Herb's welding. This is a guy that was pulling a tool kit off. That's not a major part of his job, and there's nothing maritime in nature there. So as I understood what you were saying, you were distinguishing Thibodeau, which your friend on the other side relies on. Could you distinguish Mongolia because I thought he relied pretty heavily on it? Absolutely, and I think if you go back and read the facts of, and I don't know how to pronounce it either, that gentleman was injured trying to loosen a frozen valve. And early on in his career, a big part of his job was working on crew boats and going out and loading and unloading supplies and tools to facilitate his work. But at the time he was hurt and the time that was an issue for the BRB and the 5th Circuit, he did not do anything as far as loading and unloading a vessel. He was not unloading a vessel at the time he was hurt. That was not even 1% or 2% of his job. He was actually dealing with trying to unstick a frozen valve. And that, I think, Your Honor, goes more to the Zobeda, I don't know if I'm pronouncing that right either, issues where you're dealing with someone who's not actually in the boat, there's no doubt that that's, I think the determinative factor is that Mr. Malta was literally unloading a vessel. And that vessel was in Maritime Commerce. That cylinder was being brought in to be sent back to shore to be recharged. They were paying the individual to do that. And I think based on that, Your Honor, the BRB, the ALJ, everybody got it right, and I would suggest that we affirm this decision. Any other questions? Thank you. Mr. Boyle. Thank you, Your Honor. May it please the Court. Your Honor, the focus of Longshore Act coverage is the loading and unloading of vessels. And the Supreme Court, a CITUS is covered under the statute if it is customarily used to load and unload vessels. And the Supreme Court has said that the there's no question here that such a facility was customarily used to load and unload vessels. And there's no question that Mr. Malta was engaged in that loading and was actually injured while in the act of unloading a ship. Now, counsel for the appellant wants to carve out two exceptions, one for fixed platforms and one for the entire oil and gas industry. But neither of those exceptions work. There is no blanket CITUS exemption for fixed platforms. Fixed platforms are considered islands under Supreme Court law. There is no separate standard in the act for islands generally or fixed platforms specifically. They just have to meet the same standard that any other other adjoining area meets, which is to say that they must be customarily used to load or unload vessels and they must abut water. And the central facility meets both of those requirements. So we know there's no exception for fixed platforms because of the Hudson case, which was a fixed platform. And this also bleeds into the exception for oil and gas workers. Mr. Hudson was an oil and gas worker working on an oil and gas cross-sailing platform, and he was loading actual oil. But the court found that he was a covered employee because he was loading that oil onto ships. What makes things maritime is the loading of things onto vessels. So if you're loading onto a tank or a truck or a train, then you're not covered. If you're loading onto a vessel, you are covered. If you're unloading from a vessel, you're covered. The exception for cargo that is related to the oil and gas industry also does not work because cargo that is coming off a vessel or going to a vessel isn't divested of its maritime character just because it's going to be used for something non-maritime. That's like saying any longshore worker who unloads fertilizer can't be covered because farming is not a maritime activity. What makes cargo, or a situs, or a worker maritime is not what is being loaded or unloaded. It is that is being loaded or unloaded from a vessel. That's what Fontenot tells us. And the Gilliam case makes it even clearer. Contrary to what Petitioner's counsel said, Gilliam is not a Perini case. If you read that case, Perini is not mentioned once. It could have been decided under Perini, but it wasn't. It was decided under the status of the Longshore Act. But what it made clear is that the cargo itself does not have to serve a maritime purpose. The pilings that were being unloaded in that case were going to be used for bridge construction, clearly a non-maritime purpose. The court said that doesn't matter. What matters is that they were being unloaded from a vessel. That's what makes this guy a maritime employee. There is clearly also no exception for oil and gas cargo, not only based on Hudson, but based on the Budlosh case. Mr. Budlosh was a truck driver. And he was going sometimes from dock to dock, sometimes from land to dock. And what he was doing was unloading things off his truck onto barges, or unloading things off his barge onto truck. But what was he loading and unloading? He was loading and unloading oil and gas drilling equipment. So there is clearly no carve-out for the oil and gas industry or any of its workers. The Petitioner argues that there has to be some sort of additional maritime connection aside from unloading and loading. But there really doesn't, Your Honor. As I said in the beginning, CITUS requires that a place be customarily used for loading and unloading. And the Supreme Court has said that the loading and unloading is the maritime commerce that's required. So if a worker is actually doing that loading and unloading, he's covered. Now, the Court has looked for an additional connection for workers who are not directly involved in the loading and unloading. And what they ask then, though, the maritime connection that they're looking for is the connection to the loading and unloading process. So is that welder, is that container repairman, is that carpenter, is his work integral to the loading and unloading of vessels? If it is, he's covered. If he's not, he's not covered. Now, Judge Clement, your concurrence in the Peta case is the perfect example of that. He was a container repairman, and what the test that you set forth was, if this repairman's work stopped, would the loading operations break down? If they would, then he's integral to the loading operations and he's covered. If they wouldn't, then he's not. Well, first of all, I don't think that test applies to people who are actually doing the loading and unloading of vessels. But if it did, we know the loading would have broken down here because Mr. Malta was one of only two guys when he was on duty who was loading and unloading ships. He was — it was him and the crane repairman. So everything would have stopped if he hadn't done his job. Does the Court have any questions? One, what was Mr. Malta doing with the other 65 percent of his time? He was taking inventory. He did spend about 10 hours a week on actual vessels. Some of the vessels, it looks like they not only had a warehouse, but they had a barge down below where they would store the big tote tanks, which are big fluid containers. So he would go down there and move stuff around and take inventory there and make sure he had inventory in the warehouse, order supplies, send things back. That was another thing he did. He put things back on a vessel to go back to shore for repair. He would send the tote tanks back by vessel. So he was a warehouse worker, effectively, except for the times when he was actually loading and unloading stuff from the warehouse or to the warehouse. Correct. Any other questions? Thank you. Thank you. Mr. Sewell, rebuttal. Your Honors, I think one thing that needs to be set forth, and I apologize if I wasn't really clear about this. The Thibodeau case that we've talked about, in that particular case, the fixed platform was on piers just like this one, more in a marshy area than an open body of water like Black Bay. But in that case, what had happened below was everyone said, well, that's like a pier. That's just like a pier. They're loading and unloading. And the Fifth Circuit took one look at that and said, no, you've still failed to find out whether there's a maritime purpose to all of this. In this case... If the central facility was connected, was a wharf and warehouse, as it was prior to Hurricane Katrina, would your argument be exactly the same, or would you agree that Mr. Malta's covered? I think it would be the same, Your Honor, because then it would be essentially an island. What they called it in this case was an offshore dock. They didn't use the word pier like they did in Thibodeau. That didn't work before. But here they used the term, it functions just like an offshore dock. So I think the fact that whether it's an open body of water or in the marsh doesn't really matter. In fact, if you go on Google Maps and you can actually look at it, you can see it's a seaplane base now, but you can see all the pilings where the facility used to be. Bottom line here is it still has to have a maritime purpose. And that's where the disconnect is, I think. The Supreme Court was crystal clear. Gilliam came out before the Supreme Court. A lot of these other cases came out before the Supreme Court where they said, the Fifth Circuit, you got it wrong. Oil and gas production work, which we had always held was maritime commerce, is not maritime commerce. So all the stuff that you're doing, and in the Munguia case itself, the Fifth Circuit said while loading and unloading of ships was undeniably required in order to complete these tasks, that fact alone does not warrant our concluding that Munguia thereby engaged in maritime employment. You're doing oil and gas work. You're not doing long-shoring work. And there is a carve-out. It's not something I wish for. It's been in place for 35 years. And it's a hallmark of this particular area of work that gets done in the Gulf of Mexico. One of the other points I want to make is in these cases where they try to distinguish that, well, Mr. Malta was actually physically loading and unloading and these other guys weren't. Munguia, who unstuck the valve when he got injured, well, where did the tool come from? It came off his boat. He unloaded it. And again, the courts have consistently said, this circuit has consistently said, that is not the loading and unloading that we're talking about. Yeah, there is a global wish for uniformity in terms of handling maritime commerce, but the Supreme Court has carved out in Herb's Welding in 1985 that this is not maritime commerce, plain and simple. With respect to status, Clement asked what percentage of his time was spent in unloading and unloading vessels, and the response was 25 to 30 percent. Do you dispute that the record shows that? That's what he testified. And again, the facts aren't in dispute. I mean, they really aren't. Again, just like I cited to you in Munguia, loading and unloading of ships is undeniably required. You know, any fixed platform, even the fixed platform in Herb's Welding, had to be supplied by loading or unloading a ship. Those guys had to eat and they had to drink and they had to brush their teeth and all that kind of stuff. So, loading and unloading unquestionably takes place. The distinction here is that this has been carved out by the Supreme Court. Counsel for the government said that the Boulash case, which is a truck driver who actually was injured on a barge in navigable waters, not on a fixed platform, again, that's the distinction in that particular case. That was a case that talked about sideness for guys who would kind of go in and out of their centers to time qualified as maritime employment. That's not the issue here because, again, he was a truck driver. This is a guy who works 100% of his time at the central facility, never gets in the boats to go out to the satellite wells. That's what his testimony was. I'm not going to quibble. The facts are pretty clear that he didn't do cargo work. He didn't move things around. He actually took inventory of the totes on that barge because that was his job to make sure that whatever the SKU number was matched to what his computer said was supposed to be. He wasn't the crane operator. He didn't do that. He wasn't the roustabout. He didn't hook up the cargo. He was the warehouse man. At the end of the day, what we have here is a total lack of any kind of connectivity to maritime commerce. I want to make sure we're clear, too. The ALJ got it right. The very first decision Judge Price made was that this is not a maritime scientist. Once it went up, came back down, he's like, well, if this is a maritime scientist, then of course the guy's loading and unloading. He's got to have status. The ALJ was right initially. There is no maritime scientist here. The BRB got it wrong on both scientist and status and needs to be reversed. Thank you, counsel. Case is under submission. Hold on one second.